Good morning. May it please the Court, Russell Blau for Petitioners. I will be dividing time this morning with my co-counsel. I will be addressing the Chevron 1 plain meaning issue, Mr. Mills will be addressing Chevron 2 issue, and Ms. Joyce will be addressing the arbitrary and capriciousness issue. We see this case as being about the FCC's effort to undermine a clear congressional directive that competitive carriers should be able to adopt individual terms of interconnection agreements negotiated or arbitrated by incumbent telephone companies. Our clients, the petitioners, are among the competitive entrants who are seeking to obtain interconnection, not unlike what you heard in the previous case, can be a contentious and lengthy process. In 1996, Congress adopted the Telecommunications Act. It made dramatic changes in the structure of the local telephone market. A key part of this scheme was Section 252, which established the procedures for negotiation and, if necessary, binding arbitration of these terms of interconnection. These are complex agreements that cover a wide range of topics. A single interconnection agreement can easily take up the same volume as the two volumes of record excerpts that we have filed in this case. Congress also recognized that there was an imbalance of bargaining power between the entrenched incumbents and the new entrants. Arbitration could be costly, could delay market entry, and in that context, Congress adopted Subsection I of 252, which gives carriers the option to bypass this process by adopting the terms of other agreements. The specific terms of the statute itself are simple and clear. A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party, to any other requesting telecommunications carrier, upon the same terms and conditions as those provided in the agreement. If it were simple and clear, we could all go home right now. And this would never have happened. Well, in 1997 here Can we focus in? Yeah, I understand all that. And it's unseemly. I mean, or it's I. Or both. For the same body to say, on the one hand, it's crystal clear, and on the other hand, oh golly gee whiz, it's ambiguous now that we think about it. But, you know, this whole thing just turns on why it's not ambiguous. So it seems to me if you can say, I read it, and I can read it two ways. I mean, it just, you can. And nobody's ever said otherwise. I mean, except the Commission on its original take. Eight Circuit didn't. Supreme Court didn't. But you read it, and it can either mean that you can choose an element, and with it all the relevant terms and conditions, or it can mean you can choose to go with a carrier, one element of the agreement that you want, but so long as you take it on all the terms and conditions in the agreement. Go both ways. So why am I wrong in saying it can go both ways? Well, if I could respond to one other point you made, the Supreme Court never said that the statute was ambiguous. It never said anything one way or the other. It didn't say one. Presumably, I mean, implicitly, if the Supreme Court had thought it crystal clear, then the Supreme Court would have perhaps said so, although it wasn't exactly cast that way. It wasn't cast explicitly either way. And you certainly can read the Supreme Court's opinion saying it really doesn't matter because we're going to come out the same way either way, whether we think the statute's ambiguous or whether it's unambiguous. The specific reason which we say the statute is unambiguous is the reason the FCC gave in 1997, that if you read it the way they're trying to read it now, you basically are striking words out of the statute, specifically the words, any interconnection service or network element. You render them, as the FCC said, near surplusage. And it's the point that they don't even know. Right. Because the competitive carrier can say, you know, this is the element I want, and then go get it, but on the same terms and conditions as apply to an entire agreement. It doesn't do the obverse. That is, it doesn't protect a particular element from a competitive carrier's wish to have it. Well, I think that's you've summed up the FCC's argument that if you only want to get some of the elements, you can get only some of the elements, which is true. But what if you want to get some of the elements out of AT&T's interconnection agreement, and you want to get some of the other elements out of Verizon's The FCC won't let you do that. The original FCC interpretation back in 1997 would let you do that. What about the following? As I read the Supreme Court's opinion in AT&T when it goes up the first time from the Eighth Circuit, they don't quite say so, but they seem to think that the wording pushes very strongly in the direction for which you are now arguing and the direction the FCC decided. But the FCC now, and I think this is not misreading what the FCC not only is doing, but is even saying, the FCC is saying, you know, in the light of experience, this hasn't worked very well. And there is enough play in the statute to give us room to interpret the statute in such a way that it will work better. What's wrong with the FCC doing that? Because we contend there's not enough play in the statute that they're doing exactly what Congress told them not to back in 1996. If the Congress had written the statute differently, maybe they would have that discretion. The Supreme Court in the AT&T v. Iowa case basically was responding to a policy argument that, you know, this isn't going to work very well. It's going to stifle give and take. And yet the Supreme Court said, well, that sounds eminently fair, but in effect, they said it doesn't matter because the statute clearly says any interconnection, network element, or service. They said that the FCC's interpretation tracked the most readily apparent meaning of the statute, which is a term that's practically synonymous with plain meaning. Well, just reading this, I had a question that I don't know has really been addressed, whether a local exchange carrier can make available, say, a network element and make it available on the same terms and conditions as those provided in the agreement. Can you sever an element and make all of the terms of the agreement applicable to it? Under the original rule, you could do that. You could say, I only want to purchase No, I mean, but can you, as a matter of fact, look at an entire agreement and say, I only want this element, but all the terms of the agreement are going to apply to this one element? Can you really do that? In effect, that's what we were doing from 1999 until 2004 in the industry. You can say, I want to buy dedicated circuits out of this agreement, and I want to buy switched circuits out of this agreement, for example. And the FCC What about compensation, though? Can you sever the compensation automatically within the agreements? Generally, the compensation is based on the particular service you're buying. So, yes, you could purchase out of Agreement 1 one service and pay the rate for that service that's in Agreement 1. And you can buy a different service out of Agreement 2 and pay the rate for that service that's in Agreement 2. But you're saying that's what you've been doing since the AT&T decision by the Supreme Court until now. Correct. But as I read the FCC the second time around, they're saying, but, you know, it's actually not happened that much. And our experience is that, in fact, people would plan to take it or leave it with the whole thing as a matter of practical experience. I think Ms. Joyce will address that. But I think the short answer is it certainly did happen to some extent. I don't want to take up the rest of my colleagues' time. Sure. Thank you. May it please the Court, David Mills representing Cox Communications. And as Mr. Blau explained, I'm going to address Chevron 2. I'd like to go right to the point that the Court was addressing. There is not enough play in the statute to allow for what the FCC has done. As we've argued in our brief, the MCI telecommunications versus AT&T decision really should guide the decision in this case. In that case, Congress had enacted Section 203 of the Communications Act of 1934. That was the fundamental tariffing requirement for all common carriers. Many years later, the FCC determined that that policy wasn't working very well in its opinion. It held hearings and found that, in fact, the tariffing requirement was burdensome, costly. It was actually causing problems because it was stifling competition, creating parallel pricing issues in the marketplace. It held a series of hearings and decided to exercise discretion that it had under another section of Section 203. Congress gave the Commission the explicit authority to modify the tariffing requirements. The FCC read that and decided that it had the authority under the modification language in that statute to make the tariffing requirement optional for non-dominant carriers in the market. This is the decision that was reversed by the D.C. Circuit and went to the Supreme Court in a decision authored by Justice Scalia. The Court said that the Commission went too far. It took its discretion, which is very analogous to the situation in this case. The Commission had policy reasons why the initial policy choice made by Congress to require tariffing was no longer working in the Commission's view, in its expert opinion. And the Court, Justice Scalia said it had considerable sympathy, I think were his exact words, for these policy concerns that the Commission had, but the Court found that the agency went too far in exercising its discretion that clearly it had to interpret the terms and to modify specific authority to modify the tariff requirement because what it really did, in effect, was eliminate the tariff requirement for certain carriers. That's directly analogous to this case. The statute in this case, Section 252I, is 45 words. Nineteen of those words would be completely superfluous if Congress intended to be adopted. This is a matter of plain meaning, as Mr. Blau already argued. It's also the interpretation that the FCC made of that same statute in 1997. The agency is now today coming in and saying that because it has authority and it has discretion to determine what same terms and conditions means, it can essentially reverse the policy choice that Congress made to require individual elements to be made available. The Commission does not dispute that it must make individual interconnection services and network elements available to SEALEX, that ILEX must make individual interconnection services and network elements available. But it goes on and it says that it can do so by requiring SEALEX to adopt entire agreements, not any interconnection service or network element, but all interconnection service and network elements in any particular agreement. That goes too far, just like the Commission went too far in the MCI case. The policy decision was already made at the congressional level. The other point I'd like to make under Chevron 2 is that the Commission has not provided to this Court so that this Court can perform its function to review the agency's decision. The agency has not provided the reasoned analysis that is required under the circumstances where it has changed its view. This isn't even a situation where Congress clearly left discretion to the agency and the agency has decided to change the policy based on changed circumstances. Clearly, the agency wants to change policy based on what it perceives to be a better policy. But the first time around, it actually said the statute was plain on its face. Kagan. Well, let's put too fine a point on it. What difference does it make what the FCC thought? Because our system is up to us to decide whether the statute is clear or ambiguous. Absolutely. That's something on which we don't hold deference. I couldn't agree more. And that's the Chevron 1 analysis. And as far as I'm concerned, we could stop there. But if the Court is going to assess what the FCC has to say at all, the FCC has an obligation to provide a reasoned analysis at a minimum that has got to mean that it's going to rebut what it said in 1997. In 1997, the Commission said that the statute was plain and plain ‑‑ Congress plainly made a distinction between whole agreements and individual elements of agreements. That was a distinction Congress made in the statute. And that's clear from what Mr. Blau just read from the statute. That's a distinction that supports the plain-meaning argument that we are espousing. And that's the plain-meaning argument that the Commission adopted and the Supreme Court affirmed. There's no explanation today, none, in the second report in order or in the briefs as to what happened to that distinction. The same thing is true for the superfluous words. In 1997, the FCC said you would render the statute, and we have it on page 32 of our brief, there's 19 out of 45 words would be completely unnecessary if the all-or-nothing rule were permitted by the plain meaning of the statute. That's a plain-meaning argument. The FCC doesn't address it at all in the second report in order and doesn't address it at all in its briefs in this Court. That is not a reasoned decision. That violates the fundamental precept of what we expect of our agencies so that we can all have some certainty in regulation and the Court can do its function of reviewing an agency's reasoning. Thank you. May it please the Court, my name is Stephanie Joyce, and Mr. Mills has given me a perfect segue to speak to you briefly about the fact that even if the FCC is owed deference in this case, and we do not concede that it does, Chevron II, State Farm, and this Court of Appeals, several decisions in the people of the State of California cases that dealt with FCC orders in the early 90s, none of those cases permit the FCC to be illogical. And we submit that this order is inherently illogical, principally because it contains two very different and absolutely irreconcilable premises. We have a 30-paragraph order here. In paragraph 13, the FCC regaled us with stories as to why pick-and-choose was a major impediment to negotiations, why it led to delay, why it was bad for competition, and why it has caused problems in the industry that must be addressed. In paragraph 18, the FCC held that pick-and-choose is superfluous and is not being used to any meaningful degree. It is impossible for those two premises to coexist in a rational analysis. If pick-and-choose were not used, how could it be an impediment? If pick-and-choose were not a problem in the industry, then why this order? What was the problem they needed to solve? Well, I guess I just don't get as excited as you seem to be about the logic of it. I mean, if pick-and-choose wasn't really chosen very much, one could certainly infer that the reason it wasn't is because it was a mess to negotiate. You could do that. And a lot of folks, maybe, sure, some people did use it, but the evidence shows that, by and large, it just becomes something that people didn't want to do. Well, in fact, Your Honor, I appreciate your point. However, the evidence submitted to the FCC by the ILX themselves, specifically Verizon and BellSouth, excuse me, I misspoke, SBC and BellSouth, told the FCC that, in fact, pick-and-choose was being used quite a bit, and that was the problem, and that is why they were worried, and that's why they wanted the rule to be rescinded. Between the two carriers, by their own data submitted in the record, 28 percent of the interconnection agreements that were in effect at the time that comments were submitted were forged via pick-and-choose, 28 percent. That's quite a significant figure. And it is because of that significant figure that the ILX urged the FCC to get rid of pick-and-choose, and the FCC listened to those arguments, and in large part, in the beginning of the order. Kagan. If your position collectively isn't correct, that the statute precludes it, then why isn't that sufficient evidence to support the agency's conclusion? Precludes it, meaning precludes all or nothing, or precludes pick-and-choose? Yes. I mean, if you're wrong on that, I mean, if all or nothing is an interpretation that the statute allows, then why isn't there sufficient evidence to support it? In fact, Your Honor, even assuming that there is significant wiggle room in the statute, the evidence given to the FCC was overwhelmingly against all or nothing. We had 49 SELEX participating at the FCC, and 47 of them begged the FCC to retain pick-and-choose. I'll quote one very salient comment from a SELEX called Lexstar. There's evidence the other way, and there's a bunch of state commissions that have gone the other way. I mean, here it's not up to us to make the decision, so the question is, was it just wholly without any basis in the record? It very nearly was without any basis in the record, Your Honor, and I submit that there were only seven carriers that supported the repeal of pick-and-choose, and four of them were the ILACs that were trying to get rid of the rule. Select carriers, I guess. So you have 47 SELEX, two state commissions, two trade associations, and MSUCA on the side of retaining the rule. You had four ILACs, a few SELEX, and two state commissions against pick-and-choose. Clearly, the balance is clearly in favor of retaining pick-and-choose. Is that what the FCC has to do, is just count noses? No, absolutely not, Your Honor. But they do have to acknowledge when those whom they regulate are so clearly and demonstrably in favor of a certain policy outcome. And I refer you to the State Farm decision in which the FCC instructed that if an agency renders an implausible result, offers an explanation for its decision that runs counter to the evidence before it, it should be reversed even under a deferential review. We think that is entirely appropriate here. The FCC took the 5 percent of the votes, if you will, read ambiguity into a statute that it had never seen before, and rescinded a rule that dozens of carriers told them was absolutely necessary to competition. I recognize you're at the end of your time, so maybe this can be a quick answer. I hope so. In your view, why did the FCC, and in your view unjustifiably, so favor the ILEX? I could only speculate, Your Honor. It mystifies the SELEX as well, and it's a regrettable outcome that we feel is absolutely outside the bounds of what the agency was permitted to do and certainly was not permitted under any reasonable interpretation of the statute. Thank you. May it please the Court, my name is James Carr, and I represent the Federal Communications Commission. Mr. Mills invited you to pay attention to Justice Scalia's opinion in MCI v. AT&T, and I couldn't agree more because I think it actually supports the FCC's position in this case. If you go to Justice Scalia's opinion in that case, the 1994 decision, the FCC in that case had construed Section 203 of the statute, which allowed the Commission to modify certain tariffing requirements, and had said that it was going to, in certain circumstances, eliminate those requirements. And Justice Scalia believed, and the Supreme Court agreed, that the Commission could not read the term modify to eliminate the tariffing requirements. Justice Scalia was, in fact, somewhat sympathetic with the Commission's policy views there, and he said at page 231 and 232 of that opinion, what we have here in reality is a fundamental revision of the statute, changing it from a scheme of rate regulation in long-distance common carrier communications to a scheme of rate regulation only where effective competition does not exist. That may be a good idea, but it was not the idea Congress enacted into law in 1934. And Justice Scalia concludes that opinion with similar words. He says that the FCC's approach was, quote, effectively the introduction of a whole new regime of regulation or a free market competition, which may well be a better regime, but is not the one that Congress established. Now, Justice Scalia is no shrinking violet. When he wants to, he can make very clear, and the Supreme Court can as well, that a particular statute unambiguously mandates a particular result, and that notwithstanding good policy reasons for the FCC going in another direction, it can't do so. Compare that to the Iowa Utilities Board case when the Supreme Court was reviewing the FCC's pick-and-choose rule. Justice Scalia describes the incumbent lex argument concerning the all-or-nothing rule. He says a carrier who wants one term from an existing agreement, the incumbents say, should be required to accept all the terms in the agreement. That's the rule that the Commission later adopted. Justice Scalia there says, although the latter proposition seems eminently fair, it is hard to declare the FCC's rule unlawful when it tracks the pertinent statutory language almost exactly. Now, that's very different from saying that proposition may be fair, but it's not what Congress permitted. Justice Scalia goes on to talk at great length about how the FCC's interpretation is reasonable. And later on, he defers to the FCC's policy considerations about how its rules may or may not affect negotiations in the future. All of that would have been irrelevant, would have been superfluous if this were a clear statute that mandated the pick-and-choose rule. Obviously, the Supreme Court was leaving the door open for a subsequent interpretation. And the FCC went back to the statute after eight years of experience, eight years of disappointing experience under the pick-and-choose rule, and it determined there was sufficient ambiguity in the statute, in particular focusing on the phrase upon the same terms and conditions as those provided in the agreement. The statute simply does not specify whether the same terms and conditions means some of the terms and conditions in the agreement or all of the agreement's terms and conditions. So it was reasonable for the FCC to interpret that phrase to mean all of the terms and conditions. And the FCC had good policy reasons for doing it, too. I'd like briefly to respond to Ms. Joyce's argument about the FCC finding pick-and-choose superfluous. And as we explained in our brief, Petitioners have repeatedly misunderstood what the Commission meant by superfluous there. If you read it in context, the Commission was not saying that pick-and-choose was not being used at all. It was simply saying that the discrimination protections against that pick-and-choose provided had become superfluous because, in fact, what was happening was that many more competitive carriers were actually adopting entire agreements than the FCC had originally anticipated when it adopted pick-and-choose. Back in 1996, when it decided not to go along with the all-or-nothing approach that the incumbents had advocated at that point, the Commission said that it believed that few, if any, competitive carriers would be willing to adopt another competitor's entire agreement with an incumbent, and that, therefore, an all-or-nothing approach would appear to eviscerate Section 252I. Well, experience proved that prediction wrong. And so the Commission quite reasonably took another look at the situation and decided that an all-or-nothing approach would be better from a policy perspective. Because, for one thing, it would enable a more freewheeling climate of negotiation, the sort of give-and-take that is not happening now. And notwithstanding the fact that some of the competitors are saying that the incumbents will not negotiate, Congress made a different assumption. It's right there in the statute under Section 252A1. Congress has made negotiation a cornerstone of this entire system. And, therefore, the SEC felt obligated, given that the current system of negotiation seemed to be at an impasse and that only standardized agreements were being produced, that the Commission thought it made the most sense to go ahead and try a new approach that would improve the incentives of all carriers to negotiate creative agreements that could be tailored to individualized carriers' needs. That makes perfectly good practical sense. And, certainly, a court of appeal is in a bad position to second-guess the practical judgment of an expert agency. Yet I have to say I have trouble getting around the language of the statute itself and trouble getting around the Supreme Court's decision and its language when it reverses the Eighth Circuit the first time around. That is to say, I have trouble with a little, with a fair amount of work, I guess I can make the statute ambiguous. But I've got to work at it pretty hard. And the Supreme Court didn't find it particularly ambiguous. The only court that seems to have done so is the Eighth Circuit that got reversed. Well, I think it's fair to say you want to find it ambiguous, whereas previously you found it not ambiguous at all. Well, let me back up a second, Your Honor. I think that the FCC itself, at least as an argument that can be made back in the local competition order, that the FCC itself was not treating this as a Chevron 1 case. Now, it's true that the FCC's lawyers in the Eighth Circuit and to a lesser extent in the Supreme Court made a Chevron 1 argument. But I think the FCC, at least in some of the language in the local competition order, suggested that it was reading the statutory text to support a pick-and-choose rule. But be that as it may, I think Judge Rimer is absolutely correct that whatever the FCC thought back then is largely irrelevant now because it's really up to the Court to make a determination as to whether or not this is ambiguous. So I'll get to your point about the Supreme Court did say in Iowa Utilities Board that it found the FCC's interpretation not only reasonable but the most readily apparent reading of the statute. Now, of course, most readily apparent reading of the statute is different from the only conceivable reading of the statute. Well, and the Court also says in the previous paragraph, it's hard to declare the FCC rule unlawful when it tracks the pertinent statutory language almost exactly. I mean, it's hard to read that language as the Supreme Court saying, you know, this is ambiguous and the FCC has the right to interpret ambiguous language and we will defer under Chevron. Well, even if you cannot read the Supreme Court's decision as clearly standing for the proposition that this is Chevron 2, I think equally you cannot read it to say what the Petitioners say it does, which is that this is plainly a Chevron 1 case. So I may be stuck with actually reading the statute? Unfortunately, I think that's right, Your Honor. And it's pretty rough going. As Justice Scalia points out in the very next paragraph of that opinion, it would be gross understatement to say that the 1996 Act is not a model of clarity. It's many important aspects and a model of ambiguity. I want to focus on the words you just read to me. He doesn't say this provision. He says Act. Now, that's right. But, Your Honor, I think you've had some experience already with cases involving 1996 Act provisions. There have been scores of appellate court cases and some Supreme Court cases interpreting provisions of this statute, and it's hard to find any but a handful that actually say that a particular provision of the statute is unambiguous. I think there's good reason for that. I think for one thing, Congress was faced with two competing groups, the competitors and the incumbents who are still competing to this day. It would have been impossible for Congress to pass a statute that was all that clear that would have satisfied both groups. So there was a certain amount of ambiguity that had to be built into the statute. In addition, the commission – Congress most likely believed that the commission needed a certain amount of leeway to deal with what was a revolutionary new regulatory scheme. This was the first time that an effort was being made systematically to open up local markets, local telecom markets to competition. They had long been dominated by local monopolies, and here was this system involving interconnection agreements that could be negotiated or arbitrated. It was a brand-new system. The FCC at the time that adopted the pick-and-choose rule had had only about six months to put together a slew of different rules. It was an exhausting process, and the commission was flying blind at that point, frankly. It did not have the sort of experience with this kind of system that eight years ago it did when it took a new look at the statute, and it believed that the most sensible approach in light of eight years of disappointing experience was to change to an all-or-nothing rule. If the Court has no further questions, I'd like to yield the rest of my time to Mr. Stretch, who's appearing for the incumbent intervenors. Thank you very much, Your Honors. Good morning. Colin Stretch on behalf of the ILAC intervenors. I'd like to begin by picking up on Judge Fletcher's question about the precise language of the statute, because I do think under some bit of scrutiny it's clearly ambiguous. As we know from the discussion this morning, the ILACs have to make available, quote, any interconnection, service, or network element in an agreement, and then the second clause that's instructed here is under the same terms and conditions as those provided in the agreement. Now, there are several different ways to give content to that language. Now, we know from the FCC's first go-round upheld in the Supreme Court that you can give individual components of an agreement. Now, an alternative here, and one that hasn't really been given a lot of attention, would have been for the FCC to actually restrict opt-in rights for CLECs to only interconnection, service, or network element language. As Judge Nelson pointed out earlier, you're going to have in any given interconnection agreement a wealth of terms that go beyond specific interconnection, service, network element. You can have things like dispute resolution, escalation provisions, indemnifications, all manner of things that means giant interconnection agreements. What the FCC presumably could have done is said, all of that stuff is beyond the pale. We're only going to let you have access to interconnection, service, or network elements. Now, a third way, of course, is to let CLECs opt into entire agreements. Now, this, of course, guarantees that any interconnection, service, or network element included in an agreement would be available under the opt-in rights. Interconnection, services, network elements, those are all encompassed in agreements. By giving CLECs access to entire agreements, you necessarily give content to that phrase, any interconnection, service, or network element. And, of course, the beauty of that approach is it absolutely guarantees in a way that no other rule could. It guarantees that that access will be under the same terms and conditions as those provided in the agreement. If you have to take the whole agreement, there's no use messing around about, you know, whether a particular dispute resolution was somehow tied to a particular interconnection arrangement. It doesn't matter because you take the whole agreement as a whole. You, therefore, get each. In a perfect practical sense, let me read to you from the statute. I'm now at 252A1 with the head, Voluntary Negotiations. The second sentence in that 252A1 says, The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. Now I'm skipping to what we've been focusing our attention on. Subsection I, the local exchange carriers shall make available any interconnection, service, or network element provided under agreement approved under this section to which is the party and any other request in telecommunication carried upon the same terms and conditions. As I read that sentence from A1, it fits perfectly with the other side's argument as to what's happening here in subsection I. That is to say, you're required in the contract to set out each element and price it separately so that when it gets to subsection I, I can pick and choose because you've priced them separately. Your Honor, no one is here disputing that the reading you have proffered is permissible. And, in fact, that's what the SEC came up the first time around. It's within the bounds of the statute. I do not think this, I think what you're describing here, this imperimetaria argument, necessarily compels that result. And that's really the question here is, is the statute, albeit permissibly read in the manner Your Honor intends? But you want permissible reading that says a local exchange carrier shall make available an entire contract and only an entire contract. And the critical point there, Your Honor, is the clause in 252i that reads, under the same terms and conditions as those provided in the agreement. Now, that clause does not have a reference earlier in the statute, at least not one that's on all fours. And what that does is it creates some question. No, you're saying terms and conditions is a phrase that creates questions? Yes, I am. I'm saying, what precisely did Congress have in mind when it said if you want X, you can get it, but you have to get it under the same terms and conditions as those included in the agreement? And that, Your Honor, is the question? Why doesn't that track precisely with the second section of 252a1, detailed schedule, itemized charges for interconnection for each service or network element included in the agreement? You've got to provide that, that you split out and price separately on the same terms and conditions as you've given. It's a most favored nation clause to say you negotiated that with the first guy, and now each term and condition are, in the terms of the statute, any interconnection service network element you have to make available on the same terms and conditions as the first guy. And the critical phrase, Your Honor, is under the same terms and conditions. What Your Honor is referring to is effectively itemized charges. That's one term. That's one condition. Okay. 252i, the key phrase here, under the same terms and conditions is much broader, as I mentioned earlier. You can't have same terms and conditions applicable to a single item? Well, I think effectively, well, under the FCC's prior rule, that's certainly what it contemplated. Exactly what it did. I think as a realistic matter, no, you can't, because these are very complex agreements that certainly if Congress's expectation of some sort of meaningful negotiations were to have any meaning, the idea of splitting out one particular item in an agreement and saying, okay, here's your price, and here's a couple of other little terms and conditions that apply only to that item, it strikes me as completely unrealistic. In any meaningful ---- Far be it from me to suggest that Congress has never been completely unrealistic. Well, Your Honor, I don't think it's ---- I think that's a fair statement. I don't think we want to reach for an interpretation of the statute that assumes it's being unrealistic. Now, what we have here ---- You see, I'm not sure it was completely unrealistic. This is a rule that's been operated under now for quite a few years, and there are a whole bunch of SELEX that seem to like it quite a lot. Well, Your Honor, and that goes to Ms. Joyce's point that 49 or 47 SELEX supported the rule. Now, to understand how this works in practice before the FCC, the data lines are quite plainly drawn. Pretty much any significant issue that comes up before the agency, you have the ILEX on one side, you have the SELEX on another. And as Judge Nelson noted earlier, you can't just point, count noses in order to get to a result. A critical point here, of course, that's overlooked in that statement is that two SELEX, SAGE and Paytech Communications, specifically argued against the pick-and-choose rule. They, in effect, crossed the line. That doesn't happen very often, unfortunately, in the climate in regulatory proceedings before the FCC. And I think it's notable, the reasons that they cited for doing so. They said, we think we can negotiate with ILEX. We think there's some room to maneuver here in reaching creative deals. Okay. And the current pick-and-choose rule makes that a nonstarter. Now, those comments are significant, I think, because they undercut the suggestion that every SELEC wanted this rule to remain in place. In fact, that's not true. SELEX went out of their way to comment in support of the FCC's new construction. And to the suggestion that the rule was actually working pretty well, I don't think that's accurate. Certainly some SELEX liked it, but that's very different from saying it worked very well. What the FCC, of course, had to do was come up with the best interpretation that gave meaning to this statutory provision at issue, considered in light of the 96 Act's purpose. And I think it's quite clear that the 96 Act contemplates creative negotiations, negotiations off the baseline of standardized terms, which have been the result of the prior rule. In light of that purpose, I think the FCC's interpretation here plainly withstands scrutiny under Chevron. If the Court has any further questions. Thank you. Again, counsel, I appreciate the quality of the argument on all sides, and the matter just arguably submitted.
judges: Rymer, T.G. Nelson, W. Fletcher